Catherine E. Ybarra (SBN # 283360)
cybarra@sirillp.com
Tyler J. Bean*
tbean@sirillp.com
Sonjay C. Singh*
ssingh@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Telephone: (213) 376-3739

(**pro hac vice admission anticipated*)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**CIVIL DIVISION**

| | |
|---|---|
| **SUSAN COLBY, ASIA HARRIS, OLUWAKEMI FOSUDO ADE,** and **DANA BERKLEY**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**VISIONWORKS OF AMERICA, INC.**,<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Susan Colby, Asia Harris, Oluwakemi Fosudo Ade, and Dana Berkley (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendant VisionWorks of America, Inc. ("VisionWorks" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from,

among other things, investigation by their counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Information concerning an individual's health is among the most sensitive, and closely guarded information in our society.

2. The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

3. Unfortunately, unbeknownst to Plaintiffs and other visitors to Defendant's website, their private personal and health information was not actually being kept private. Instead, through VisionWorks's patient scheduling software, Defendant collected and transmitted personally identifiable, sensitive health information pertaining to Plaintiffs and other patients' upcoming appointments, including the reason(s) for their appointment(s), the date of their appointment(s), and the location of their appointment(s) (collectively, "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google"), through the use of surreptitious online tracking tools.

4. Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used to fuel for a massive, targeted advertising enterprise.

5. Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is concerned about a potential vision-related issue, it will collect that information and allow its clients to use that information to stream ads related to vision care products and services to that person's computers and smartphones.

6. Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google

AdSense and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

7. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

8. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

9. Defendant is one of the companies that have chosen to prioritize its marketing efforts and profits over its patients' privacy by installing Google's Tracking Tools on its websites.

10. VisionWorks is a nationwide operator of optometry offices through which it provides vision-related medical care and retail eyeglasses, contact lenses, and other eyewear.[1] VisionWorks owns and operates over 750 office locations nationwide.[2]

11. Through the VisionWorks appointment scheduling website – www.appointments.visionworks.com – (the "Website"), patients can schedule, modify, or cancel medical appoints with VisionWorks' optometry providers. But, wherever it is installed, the Website collects

[1] *About Us*, VISIONWORKS, https://www.visionworks.com/about-us (last visited Mar. 7, 2025).

[2] *Id.*

and transmits the Sensitive Health Information provided by patients when scheduling their appointments to third parties, including Google, instantaneously and contemporaneously through the Tracking Tools.

12. Each of the Plaintiffs and Class Members used the Website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools. However, Defendant ***never*** obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to the third parties, including the largest advertiser and compiler of user information.

13. Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[3] Accordingly, Defendant's disclosure of Plaintiffs' and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

14. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

15. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against

[3] 18 U.S.C. § 1320d-(6).

Defendant: Invasion of Privacy – Intrusion Upon Seclusion; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.; violations of the California Invasion of Privacy Act, Cal. Pen. Code § 360, *et seq*.; violations of the California Unfair Competition Law, Cal. Bus & Prof. Code § 17200, *et seq*.; violations of the Maryland Wiretapping and Electronic Surveillance Act, Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq*.; and violations of the New York General Business Law § 349.

## II. <u>PARTIES</u>

***Plaintiff Susan Colby***

16. Plaintiff Colby is a citizen of the State of California, residing in Fresno County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

17. In or around April of 2025, Plaintiff Colby utilized the Website on her personal electronic devices to schedule an appointment with Defendant's clinic in Elk Grove, CA, for vision care.

18. Unbeknownst to Plaintiff Colby, the Website transmitted the Sensitive Health Information that she input into her appointment form, including the location of the VisionWorks clinic that she scheduled her appointment with, the time of her appointment, the date of her appointment, and the reason for her appointment.

19. Plaintiff Colby never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

20. On every occasion that she visited the Website, Plaintiff Colby possessed an account with Google, and she accessed the Website while logged into her Google account on the same device.

21. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Colby immediately began seeing targeted online advertisements for vision health services and products.

***Plaintiff Asia Harris***

22. Plaintiff Harris is a citizen of the State of Illinois, residing in Cook County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

23. In or around June of 2024, Plaintiff Harris utilized the Website on her personal electronic devices to schedule an appointment with one of Defendant's clinics for optometry care.

24. Unbeknownst to Plaintiff Harris, the Website transmitted the Sensitive Health Information that she input into her appointment form, including the location of the VisionWorks clinic that she scheduled her appointment with, the time of her appointment, the date of her appointment, and the reason for her appointment.

25. Plaintiff never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

26. On every occasion that she visited the Website, Plaintiff Harris possessed an account with Google, and she accessed the Website while logged into her Google account on the same device. Plaintiff Harris also provided her Google email address to Defendant through the Website, and received emails related to her appointment to her Google email account.

27. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Harris immediately began seeing targeted online advertisements for vision health services and products.

***Plaintiff Oluwakemi Fosudo Ade***

28. Plaintiff Ade is a citizen of the State of Maryland, residing in Howard County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

29. In or around June of 2024, Plaintiff Ade utilized the Website on her personal electronic devices to schedule an appointment with one of Defendant's clinics for optometry care.

30. Unbeknownst to Plaintiff Ade, the Website transmitted the Sensitive Health Information that she input into her appointment form, including the location of the VisionWorks clinic that she scheduled her appointment with, the time of her appointment, the date of her appointment, and the reason for her appointment.

31. Plaintiff never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

32. On every occasion that she visited the Website, Plaintiff Ade possessed an account with Google, and she accessed the Website while logged into her Google account on the same device.

33. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Ade immediately began seeing targeted online advertisements for vision health services and products.

***Plaintiff Dana Berkley***

34. Plaintiff Berkley is a citizen of the State of New York, residing in Schenectady County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

35. In or around November of 2024, Plaintiff Berkley utilized the Website on her personal electronic devices to schedule an appointment with one of Defendant's clinics for optometry care.

36. Unbeknownst to Plaintiff Berkley, the Website transmitted the Sensitive Health Information that she input into her appointment form, including the location of the VisionWorks clinic that she scheduled her appointment with, the time of her appointment, the date of her appointment, and the reason for her appointment.

37. Plaintiff never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

38. On every occasion that she visited the Website, Plaintiff Berkley possessed an account with Google, and she accessed the Website while logged into her Google account on the same device. Plaintiff Berkley also provided her Google email address to Defendant through the Website, and received emails related to her appointment to her Google email account.

39. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Berkley immediately began seeing targeted online advertisements for vision health services and products.

***Defendant VisionWorks***

40. Defendant VisionWorks of America, Inc. is a for-profit corporation incorporated in the State of Texas with its principal place of business at 175 E. Houston Street San Antonio, Texas 78205, in Bexar County.

## III. JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

42. This Court has specific personal jurisdiction over Defendant VisionWorks because it has availed itself of the rights and benefits of the State of California, including by (1) providing services in this District; (2) conducting substantial business in this District, including, but not limited to, business with Plaintiff Colby, and (3), perpetuating unlawful acts in this District.

43. Venue is proper in this District under 28 U.S.C. § 1391(a)- (d) because: a substantial part of the events giving rise to this action occurred in this District, including because Defendant

collects and redistributes Class Members' Sensitive Health Information in this District; and Defendant caused harm to Class Members residing in this District, including Plaintiff Colby.

## IV. FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i. Google's Mass Advertising Surveillance Operation

44. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

45. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

46. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that "[m]any websites and apps use Google services to improve

---

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Mar. 7, 2025).

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Mar. 7, 2025).

[6] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Mar. 7, 2025).

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Mar. 7, 2025).

their content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

47. Google also admits that it uses the information collected from third party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

48. While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendant were part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

49. Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[10] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level,

---

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Mar. 7, 2025).

[9] *Id.*

[10] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[11]

50. Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[12] and Google trackers are present on 74-percent of all web traffic.

51. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[13] In fact, Google advertising trackers were found on 73-percent of pornography websites.[14]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[15]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[16] For example, when an online shopper

---

[11] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Mar. 7, 2025).

[12] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Mar. 7, 2025).

[13] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[14] *Id.*

[15] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[16] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Mar. 7, 2025).

> searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[17]

52. This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[18]

53. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[19]

54. When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[20]

55. Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[21] And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[22]

---

[17] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Mar. 7, 2025).

[18] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Mar. 7, 2025).

[19] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Mar. 7, 2025) ("Google Analytics gives you the tools, free of charge"),

[20] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Mar. 7, 2025).

[21] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[22] *Id.*

56. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[23]

### ii. Pixels Can Record Almost Every Interaction Between a User and a Website

57. In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto the Website.

58. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[24]

59. Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information

[23] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[24] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Mar. 7, 2025).

provided by the user on an online form—all transmitted in real-time as the user navigates a website.[25]

60. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[26]

**iii. The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to Google**

61. Every website is hosted by a computer "server" that holds the website's contents.

62. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

63. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images,

---

[25] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Mar. 7, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Mar. 7, 2025).

[26] *Lurking Beneath the Surface, supra* note 24.

words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

64. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[27] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[28] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[29]

65. When a Google user logs onto their account, their web browser records a Google tracking cookie.[30] This cookie includes a specific line of code that links the web browser to the user's Google account.[31]

66. Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

67. Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

68. The Pixels then combine the data received from the browser with the data acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity,

[27] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Mar. 7, 2025).

[28] *Id.*

[29] *Id.*

[30] Cyphers, *supra* note 10.

[31] *Id.*

via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

69. A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[32] When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

70. However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

71. Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

72. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[33] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[34] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

---

[32] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Mar. 7, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Mar. 7, 2025).

[33] Cyphers, *supra* note 10.

[34] *Id.*

**iv. Defendant Disclosed Plaintiffs' and Class Members' Sensitive Health Information to Google.**

73. To schedule or re-schedule an optometry appointment with VisionWorks, Plaintiff and Class Members were required to complete a scheduling form through the Website.

74. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant while scheduling their appointments to third parties, including Google.

75. The following screenshots ("Figures 1-3") depict the network transmissions made by the Google Tracking Tools installed on the Website. As Figures 1-3 show, when patients schedule an appointment in the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website include the fact that the patient made a medical appointment, the address of the VisionWorks location where the patient has scheduled their appointment (in this example, 11802-B, Rockville Pike, Rockville, MD), the date of the appointment (in this example, the March 21st), the VisionWorks 'store ID' assigned to the location (in this example, #505), and the reason for the patient's appointment (in this example, an eye exam).

76. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiffs to their identities. The following screenshots show that the Google Pixel on the Website transmitted the identifier numbers attached to Google's 'cid,' cookies, which identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

/

/

/

/


Query String Parameters view source view URL-encoded
v: 2
tid: G-1GDWS0Z6EP
gtm: 45je53a1v882827455za200zb71974219
_p: 1741805965204
gcs: G100
gcd: 13p3p3p3p5l1
npa: 1
dma_cps: -
dma: 0
tag_exp: 102015666~102482433~102587591~102640600~102717422~102788824~1
2791784~102813108~102814060~102825837
tt: external
cid: 1509422275.1741805966
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;134.0.6998.88|Not%3AA-Brand;24.0.0.0|Google%20Chrome;13
4.0.6998.88
uamb: 0
uam:
uap: Windows
uapv: 19.0.0
uaw: 0
are: 1
frm: 0
pscdl: denied
_eu: AEE
_s: 6
dp: /
dl: https://appointments.visionworks.com/#/schedule-appointment?storeI
=505
sid: 1741805966
sct: 1
seg: 1
dr: https://locations.visionworks.com/
dt: Appointment Scheduler | Visionworks
en: form_start
ep.hostname: appointments.visionworks.com
ep.gtm_settings: GTM-5ZGQ3R | 374 |
ep.form_id:
ep.form_name:
ep.form_destination: https://appointments.visionworks.com/#/schedule-app
intment?storeId=505
epn.form_length: 44
ep.first_field_id: month-day-21
ep.first_field_name: appt-day
ep.first_field_type: radio
epn.first_field_position: 27
_et: 2942
tfd: 18487



Query String Parameters view source view URL-encoded
v: 2
tid: G-1GDWS0Z6EP
gtm: 45je53a1v882827455za200zb71974219
_p: 1741805965204
gcs: G100
gcd: 13p3p3p3p5l1
npa: 1
dma_cps: -
dma: 0
tag_exp: 102015666~102482433~102587591~102640600~102717422~102788824~10
2791784~102813108~102814060~102825837
tt: external
cid: 1509422275.1741805966
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;134.0.6998.88|Not%3AA-Brand;24.0.0.0|Google%20Chrome;13
4.0.6998.88
uamb: 0
uam:
uap: Windows
uapv: 19.0.0
uaw: 0
are: 1
frm: 0
pscdl: denied
_eu: AEA
_s: 12
dp: /
dl: https://appointments.visionworks.com/#/appointment-booked
sid: 1741841976
sct: 2
seg: 0
dr: https://locations.visionworks.com/
dt: Appointment Scheduler | Visionworks
en: click
_ss: 1
ep.hostname: appointments.visionworks.com
ep.gtm_settings: GTM-5ZGQ3R | 374 |
ep.link_id:
ep.link_classes: ng-star-inserted
ep.link_url: https://locations.visionworks.com/ll/US/MD/Rockville/11802-
-Rockville-Pike
ep.link_domain: locations.visionworks.com
ep.outbound: true
tfd: 36011974




*Figures 1, 2 & 3. Screenshots depicting back-end network traffic from the Website which show information transmitted to Google when Website users schedule an appointment.*

77. In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[35] Defendant purposely configured the Google Pixels on the Website to

---

[35] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Mar. 25, 2025).

collect and transmit additional user data, including the information entered by patients on its appointment scheduling forms.

### B. DEFENDANT DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

#### i. Defendant failed to inform Plaintiffs and Class Members of its disclosure of Plaintiffs' and Class Members' Sensitive Health Information, in violation of its Notice of Privacy Practices

78. Defendant's Notice of Privacy Practices assures its patients that it will keep their Sensitive Health Information private and secure and that it will only disclose Sensitive Health Information under certain circumstances, ***none of which is true.***[36]

79. Defendant breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google. Specifically, Plaintiffs and Class Members had a reasonable expectation of privacy (based on Defendant's own representations to Plaintiffs and the Class that Defendant would not disclose their Sensitive Health Information to third parties). Defendant did not inform Plaintiffs that it was sharing their Sensitive Health Information with third parties, including Google.

80. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendant violated its own Notice of Privacy Practices and breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

81. Despite never telling users like Plaintiffs and Class Members, Defendant allowed third parties such as Google to intercept Plaintiffs' and Class Members' Sensitive Health Information and use it for advertising purposes.

---

[36] *Notice of Privacy Practices*, VISIONWORKS, *available online at*: https://vsp.widen.net/s/hdhqsccwlq/notice-of-privacy-practices.

#### ii. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiffs and Class Members

82. The Tracking Tools installed on the Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on the Website.

83. Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

84. Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

85. Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

### C. DEFENDANT WAS ENRICHED BY THEIR DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

#### i. Defendant Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information

86. As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on its website.

87. Upon information and belief, Defendant, as users of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiffs' and Class Members' Sensitive Health Information.

**ii. Plaintiffs' and Class Members' Data Had Financial Value**

88. Moreover, Plaintiffs' and Class Members' Sensitive Health Information has value and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

89. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[37]

90. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

91. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[38] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[39]

92. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

---

[37] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

[38] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[39] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

93. The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

**D. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA**

94. The disclosure of Plaintiffs' and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[40]

95. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information ("PHI").[41]

96. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

97. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply ***not*** permitted to use tracking technology tools in a way that exposes patients' Private

---

[40] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 7, 2025).

[41] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

Information to any third party without express and informed consent.

98. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA* Covered *Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule.

99. Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[42]

100. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[43]

101. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

102. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

103. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual";

---

[42] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS, *available online at*: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[43] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

104. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

105. The HIPAA Privacy Rule requires any "covered entity"—which includes optometry care providers—to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

106. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[44]

107. Consistent with this restriction, the HHS has issued marketing guidance that

---

[44] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 7, 2025).

provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[45]

108. Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

109. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

110. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

---

[45] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 7, 2025).

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

111. In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[46]

112. In its Guidance regarding Marketing, HHS further instructed in 2003:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell

[46] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available online at: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

> protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[47]

113. HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

> a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);
>
> b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and
>
> c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

114. In addition, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies.[48]

115. The Bulletin expressly provides that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**"[49]

116. Tracking technology vendors like Google, are considered business associates under

---

[47] *Marketing*, HHS, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003) (last visited Mar. 7, 2025).

[48] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 7, 2025).

[49] *Id.* (emphasis in original).

HIPAA where, as here, they provide services to receive and maintain PHI.

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g*. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[50]

117. The Bulletin further explained that health care providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> How do the HIPAA Rules apply to regulated entities' use of tracking technologies?
>
> Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual providers when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. **This is**

[50] *Id.*

> **because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e. it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care**.[51]

118. HIPAA applies to Defendant's webpages with tracking technologies even outside the Website.

> Tracking on unauthenticated webpages
>
> [T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal **… [and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances**. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[52]

119. HHS also explained in the Bulletin that tracking technologies on health care providers' patient portals "generally have access to PHI" and may access diagnoses and treatment information, in addition to other sensitive data:

> Tracking on user-authenticated webpages
>
> Regulated entities may have user-authenticated webpages, which

[51] *Id.* (emphasis added).

[52] *Id.* (emphasis added).

> require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[53]

120. The Bulletin is not a pronouncement of new law, but instead a reminder to covered entities and business associates of their longstanding obligations under existing guidance.

121. The Bulletin notes that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," then explains how online tracking technologies violate the same HIPAA rules that have existed for decades.[54]

122. In other words, HHS has expressly stated that Defendant have violated HIPAA Rules by implementing the Tracking Technologies. Courts, including in this District, have found the same under near-identical circumstances.[55]

---

[53] *Id.* (emphasis added).

[54] *Id.* (citing, *e.g.*, Modifications of the HIPAA [Rules], Final Rule," 78 FR 5566, 5598, a rulemaking notice from January 25, 2013, which stated: "[P]rotected health information … may not necessarily include diagnosis-specific information, such as information about the treatment of an individual, and may be limited to demographic or other information not indicative of the type of health care services provided to an individual. If the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules.").

[55] *See, e.g., Gaige v. Exer Holding Co., LLC*, No. 2:24-cv-06099-AH-(AJRx), 2025 U.S. Dist. LEXIS 17146, *12 (C.D. Cal. Jan. 30, 2025); *A.D. v. Aspen Dental Mgmt., Inc*., No. 24 C 1404, 2024 U.S. Dist. LEXIS 161090, at *2-10 (N.D. Ill. Sep. 9, 2024); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023).

## E. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

123. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with optometry care.

124. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

125. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[56]

126. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[57] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[58]

127. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

---

[56] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

[57] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[58] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

## V. TOLLING AND ESTOPPEL

128. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

129. The Tracking Tools on the Website were and are invisible to the average website visitor.

130. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

131. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

132. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiffs and Class Members, that by scheduling appointments through the Website, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

133. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

134. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

135. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI. CLASS ALLEGATIONS

136. This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

137. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

138. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate California, Illinois, New York, and Maryland Subclasses, which are defined as follows:

**California**

All natural persons residing in the State of California who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

**Illinois Subclass**

All natural persons residing in the State of Illinois who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

**New York Subclass**

All natural persons residing in the State of New York who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

**Maryland Subclass**

All natural persons residing in the State of Maryland who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

139. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

140. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

141. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

142. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

b) Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Health Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g) Whether Defendant violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i) Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

j) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

143. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

144. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

145. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

146. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class

Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

147. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

148. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

149. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**

**COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION**

***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, New York, and Maryland Subclasses)***

150. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 149 as if fully set forth herein.

151. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal and statutorily protected Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration and/or unauthorized sharing of their communications without Plaintiffs' and Class Members' knowledge or consent.

152. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

153. Plaintiffs and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

154. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

155. Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's Notice of Privacy Practices and other representations.

156. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

157. Defendant's disclosure of Plaintiffs' and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

158. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

159. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

160. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

161. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

162. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT II

## BREACH OF CONFIDENCE

***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, New York, and Maryland Subclasses)***

163. Plaintiffs repeat and reallege the allegations contained in paragraphs 150 through 162 as if fully set forth herein.

164. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

165. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on the

Website.

166. Plaintiffs' and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Notice of Privacy Practices.

167. Contrary to its duties as medical providers and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiffs' and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendant to third parties, including Google.

168. Defendant's disclosures of Plaintiffs' and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

169. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

170. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

d. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

e. Defendant eroded the essential confidential nature of the provider-patient relationship;

f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Sensitive Health Information, and

i. Defendant's actions violated the property rights Plaintiffs and Class

Members have in their Sensitive Health Information.

171. Plaintiffs and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiffs are also entitled to punitive damages.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**

***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, New York, and Maryland Subclasses)***

172. Plaintiffs repeat the allegations contained in paragraphs 163 through 171 as if fully set forth herein.

173. In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardians of Plaintiffs' and Class Members' Sensitive Health Information, Defendant became a fiduciary by its undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Sensitive Health Information; (2) to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and do store.

174. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its patients and former patients, in particular, to keep secure their Sensitive Health Information private.

175. Defendant breached its fiduciary duties to Plaintiffs and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiffs and Class Members of this fact.

176. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT IV

## NEGLIGENCE

***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, New York, and Maryland Subclasses)***

177. Plaintiffs repeat and reallege the allegations contained in in paragraphs 172 through 176 as if fully set forth herein.

178. Through their use of the Website, Plaintiffs and Class Members provided Defendant with their Sensitive Health Information, believing such Information would be kept confidential.

179. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

180. Defendant negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

181. Defendant further negligently omitted to inform Plaintiffs and the Class that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

182. Defendant knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

183. Defendant's conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

184. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

185. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i)

strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT V**

**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, New York, and Maryland Subclasses)***

186. Plaintiffs repeat and reallege the allegations contained in paragraphs 177 through 185 as if fully set forth herein.

187. When Plaintiffs and Class Members provided their Sensitive Health Information to Defendant in exchange for optometry-related services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

188. Plaintiffs and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

189. Plaintiffs and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

190. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Health Information to third parties like Google.

191. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

192. Plaintiffs and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

193. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT VI**

**UNJUST ENRICHMENT**

***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, New York, and Maryland Subclasses)***

194. Plaintiffs repeat and reallege the allegations contained in paragraphs 186 through 193 as if fully set forth herein.

195. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

196. Plaintiffs and Class Members conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

197. Defendant knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

198. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

199. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' Sensitive Health Information.

200. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiffs' and Class Members' Sensitive Health Information.

201. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

202. Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

203. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

204. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## COUNT VII

### VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*

### Unauthorized Interception, Use, and Disclosure

***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, New York, and Maryland Subclasses)***

205. Plaintiffs repeat and reallege the allegations contained in the paragraphs 194 through 204 as if fully set forth herein.

206. The ECPA protects both sending and receipt of communications.

207. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

208. The transmissions of Plaintiffs' Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

209. Electronic Communications. The transmission of Sensitive Health Information between Plaintiffs and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

210. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

211. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

212. Electronic, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

213. By utilizing and embedding the Pixels on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

214. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Google.

215. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information, including the reasons for their appointment, the dates of their appointment, and the location of their appointment.

216. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

217. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

218. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

219. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

220. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information does not qualify for the party exemption.

221. Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Breach of confidence;

c. Breach of fiduciary duty;

d. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3);

e. Violations of the California Invasion of Privacy Act, Cal. Pen. Code. § 630., *et seq.*;

f. Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq.*;

g. Violations of the Maryland Wiretapping and Electronic Surveillance Act, Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq.*; and

h. Violations of N.Y. Gen. Bus. Law § 349.

222. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

223. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with Google and other third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiffs and Class Members did not consent to receive their Sensitive Health Information.

224. As such, Defendant cannot viably claim any exception to ECPA liability.

225. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiffs or Class Members;

d. Defendant failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

226. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' Sensitive Health Information for financial gain.

227. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

228. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

229. Any purported consent that Defendant may claim it received from Plaintiffs and Class Members was not valid.

230. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

231. As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT VIII

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**
**Cal. Pen. Code § 360, *et seq*.**

***(On Behalf of Plaintiff Colby and the California Subclass)***

232. Plaintiffs repeat and reallege the allegations contained in paragraphs 205 through 231 as if fully set forth herein.

233. The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

234. Under CIPA, it is unlawful to:

i. "[W]illfully and ***without the consent of all parties to the communication***, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

ii. "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

iii. [A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

235. At all relevant times, Defendant aided, employed, agreed with, and conspired with Google, and likely other third parties, to track and intercept Plaintiff Colby's and California

Subclass Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Google to eavesdrop on and intercept in real-time the content of intercept Plaintiff Colby's and California Subclass Members' private communications with Defendant.

236. The content of those conversations included Sensitive Health Information, including loan application determinations. Through Defendant's installation and configuration of the Tracking Tools on the Website, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff Colby and California Subclass Members.

237. Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff Colby and California Subclass Members, transmitted the substance of their confidential communications with Defendant to third parties.

238. Defendant willingly facilitated Google's and other third parties' interception and collection of Plaintiff Colby's and California Subclass Members' Sensitive Health Information by embedding the Tracking Tools on the Website, thereby assisting Google's eavesdropping

239. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools falls under the broad catch-all category of "any other manner":

i. The computer codes and programs Google and other third parties used to track intercept Plaintiff Colby's and California Subclass Members' communications while they were navigating the Website;

ii. Plaintiff Colby's and California Subclass Members' internet browsers;

iii. Plaintiff Colby's and California Subclass Members' computing and mobile devices;

iv. Google's web and ad servers;

v. The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff Colby's and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

vi. The computer codes and programs used by Google and other third parties to effectuate their tracking and interception of Plaintiff Colby's and California Subclass Members' communications while they were using a browser to visit the Website; and

240. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties, including Google and its agents, employees, and contractors to receive Plaintiff Colby's and California Subclass Members' Sensitive Health Information in real time through the Website without their consent

241. By disclosing Plaintiff Colby's and California Subclass Members' Sensitive information, Defendant violated Plaintiff Colby's and California Subclass Members' statutorily protected right to privacy.

242. As a result of Defendant's violation of the CIPA, Plaintiff Colby and California Subclass Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## COUNT IX

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
**Cal. Bus. & Prof. Code, § 17200, *et seq.***
***(On Behalf of Plaintiffs Colby and the California Subclass)***

243. Plaintiffs repeat and reallege the allegations contained in paragraphs 232 through 242 as if fully set forth herein.

244. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

245. Defendant violated the "unlawful" prong of the UCL by violating Plaintiffs Colby's, and California Subclass Members' right to privacy, as well as by violating the statutory counts alleged herein.

246. Defendant violated the unfair prong of the UCL by:

i. Using the Tracking Technologies to record and transmit the sensitive communications made by and to Plaintiff Colby and California Subclass Members through its Website with third parties, including Google, without their knowledge of consent; and

ii. Disclosing the sensitive communications made by and to Plaintiff Colby and California Subclass Members through its Website to third parties, including Google, in exchange for marketing and advertising services.

247. As a result of Defendant's violations of the UCL, Plaintiff Colby and California Subclass Members have suffered the diminution of the value of their Sensitive Health Information, as alleged above.

248. As a result of Defendant's violation of the UCL, Plaintiff Colby and California Subclass Members are entitled to injunctive relief, as well as restitution necessary to restore to them in interest any money or property, real or personal, acquired through Defendant's unfair competition practices.

**COUNT X**

**VIOLATIONS OF THE MARYLAND WIRETAPPING AND ELECTRONIC SURVEILLANCE ACT**
**Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq.***
***(On Behalf of Plaintiff Ade and the Maryland Subclass)***

249. Plaintiffs repeat and reallege the allegations contained in paragraphs 243 through 248 as if fully set forth herein.

250. The Maryland Wiretapping and Electronic Surveillance Act prohibits any person from (1) using an eavesdropping device, in a surreptitious manner, to "record[] all or any part of any private conversation to which he or she is a party unless he or she does so with

the consent of all other parties to the private conversation"; (2) "[i]ntercept[ing], record[ing], or transcrib[ing] in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties"; and (3) "us[ing] or disclos[ing] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties." Md. Code Ann., Cts. & Jud. Proc. § 10-402(a)

251. Defendant violated the Maryland Wiretapping and Electronic Surveillance Act by:

a. Using the Tracking Technologies to record the sensitive communications made by and to Plaintiff Ade and Maryland Subclass Members through the Website with third parties, including Google, without their knowledge or consent;

b. Transmitting the sensitive communications made by and to Plaintiff Ade and Maryland Subclass Members through the Website with third parties, including Google, without their knowledge or consent; and,

c. Disclosing the sensitive communications made by and to Plaintiff Ade and Maryland Subclass Members through the Website to third parties, including Google, in exchange for marketing and advertising services.

## COUNT XI

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**N.Y. Gen. Bus. Law § 349 ("§ 349")**
***(On Behalf of Plaintiff Berkley and the New York Subclass)***

252. Plaintiffs repeat and reallege the allegations contained in paragraphs 249 through 251 as if fully set forth herein.

253. § 349 prohibits the commission of "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

254. Defendant violated § 349 by:

a. Using the Tracking Technologies to record the sensitive communications made

by and to Plaintiff Berkley and New York Subclass Members through the Website with third parties, including Google, without their knowledge or consent;

b. Transmitting the sensitive communications made by and to Plaintiff Berkley and New York Subclass Members through the Website with third parties, including Google, without their knowledge or consent; and,

c. Disclosing the sensitive communications made by and to Plaintiff Berkley and New York Subclass Members through the Website to third parties, including Google, in exchange for marketing and advertising services.

255. Defendant intended to mislead Plaintiff Berkley and New York Subclass Members and intended to induce Plaintiff Berkley and New York Subclass Members to rely on its misrepresentations and omissions.

256. Accordingly, Plaintiff Berkley and New York Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, treble damages, and attorneys' fees, filing fees, and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class and California, Illinois, New York and Maryland Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

Dated: April 3, 2025

Respectfully submitted,

*/s/ Catherine E. Ybarra*
Catherine E. Ybarra (SBN # 283360)
cybarra@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Telephone: (213) 376-3739

Tyler J. Bean*
tbean@sirillp.com
Sonjay C. Singh*
ssingh@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091

**pro hac vice admission anticipated*

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: April 3, 2025

Respectfully submitted,

*/s/ Catherine E. Ybarra*
Catherine E. Ybarra (SBN # 283360)